UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

          - v -                             :          07 Cr. 402 (RMB)

JEFFREY MUSUMECI,                           :
          a/k/a "Stevewil160@aol.com,"
                                            :

                    Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION
*IN LIMINE* TO PRECLUDE THE DEFENDANT'S ENTRAPMENT DEFENSE
OR, IN THE ALTERNATIVE, FOR A CURATIVE JURY INSTRUCTION**


                                        MICHAEL J. GARCIA
                                        United States Attorney
                                        Southern District of New York
                                        Attorney for the United States
                                                of America


Adam S. Hickey
Assistant United States Attorney

          – Of Counsel –

## TABLE OF CONTENTS

I.      Background .................................................................................................1

II.     Statement of Facts .....................................................................................2

        A.     November 23, 2005, Chat Conversation And November 23-24 E-
               mail ..................................................................................................2

        B.     November 25, 2005, Chat Conversations, Phone Call, And E-mail....................4

        C.     November 26-27, 2005, Chat Conversations And E-mail ...................8

        D.     November 28, 2005, Chat Conversation And E-mail ..........................8

        E.     November 29, 2005, Phone Call And In-Person Meeting ...................9

III.    Argument ...................................................................................................12

        A.     The Defendant Must Produce Evidence The Government Induced
               Him To Commit A Crime He Was Not Predisposed To Commit
               Before He Is Entitled To An Entrapment Defense ............................12

        B.     The Defendant Should Be Precluded From Arguing Entrapment
               Unless He Can Proffer A Factual Basis For Pursuing Such A
               Defense ...........................................................................................14

IV.     Conclusion .................................................................................................18

Defense counsel has advised the Government that he may pursue an entrapment defense at trial. Accordingly, the Government respectfully seeks an *in limine* ruling (i) precluding the defendant from raising an entrapment defense unless he is first able to proffer his factual basis for asserting the defense; or (ii) in the alternative, granting the Government a curative instruction that entrapment is not a defense in this case, should the defendant pursue an entrapment defense at trial without ultimately establishing the proper factual basis of Government inducement or creating a genuine issue of fact as to the defendant's propensity.

## I.  BACKGROUND

Indictment 07 Cr. 402 (RMB) was filed on May 9, 2007 charging two counts. Count One charges the defendant with attempting to entice a minor to engage in sexual activity, in violation of Title 18, United States Code, Section 2422(b). Count Two charges the defendant with attempting to produce child pornography, in violation of Title 18, United States Code, Section 2251(a), (e).

In his conversations with the Government and by way of his request to charge the jury on entrapment, defense counsel has indicated that he may assert entrapment as a defense at trial. Because, however, the defendant was the first to contact law enforcement and to suggest any illegal activity, he cannot meet his threshold burden of demonstrating that he was induced by the Government to commit any crime, and as a result, he is not entitled to raise an entrapment defense. Further, to any extent the defendant can show inducement, the evidence establishes beyond any reasonable factual dispute that the defendant was predisposed to commit the crimes charged. In the absence of a factual proffer sufficient to support the entrapment defense, the defendant should be

precluded from raising the defense, as the defendant's attempt to do so may prejudice and confuse the jury.  In the alternative, the Government respectfully requests a ruling that, if the evidence at trial fails to support an entrapment charge, the Court will instruct the jury that entrapment is not a defense in this case.

## II.  STATEMENT OF FACTS

This case arises from the defendant's sexually explicit online and phone conversations and an in-person meeting with two undercover New York City Police Department detectives who assumed the identity of a thirteen-year-old girl named "Lisa" who lived with her grandmother in the East Village

**A.    November 23, 2005, Chat Conversation And November 23-24 E-mail**

The defendant first contacted an undercover officer on Wednesday, November 23, 2005, at 2:56 p.m., by sending an "instant message" to the screen name "LisainNY05."  (Instant message chat conversation beginning on Nov. 23, 2005 at 2:56 p.m., Affirmation of Adam S. Hickey Ex. A (July 13, 2006) (hereinafter, "Hickey Aff.")).  At the time, the defendant was using the screen name "Stevewil160," and both Lisa and the defendant were in an America Online ("AOL") chat room named "I love older men" or something similar.  (Hickey Aff. Ex. A; Draft transcript of defendant's statement's to ADA Penelope Brady on Nov. 29, 2005, at 7:26-27, Hickey Aff. Ex. B).  Lisa's profile, which was accessible to any AOL user who looked up her screen name, indicated that she was "back in NYC for summer with grandma for at least . . . [the] school year."  (AOL profile for "LisainNY05," Hickey Aff. Ex. C).  The defendant checked Lisa's profile before he sent her the first instant message.  (Hickey Aff. Ex. B at 10:19-11:9).

Unbeknownst to the defendant, however, "Lisa" was, in fact, the undercover identity of Detective Sean Ryan, of the New York City Police Department.

The very first contact between the defendant and law enforcement in this case was the following exchange:

> Stevewil160:  Hi, My name is Steve.  I am a divorced white male.  I am 45 years old.  I am 5'10" and weigh 195.  I have an athletic build.  I live on Long Island.  I am looking for a younger woman to date.  Is 45 too old for you?
> LisainNY05:  lisa here 13 nyc
> Stevewil160:  DO you like older guys?
> LisainNY05:  sum sure
> LisainNY05:  uy like yunger
> Stevewil160:  yes-- they are eager to learn new things

(Hickey Aff. Ex. A at 2:56-2:57 p.m.).  Over the course of the next 42 minutes, the defendant had a sexually explicit conversation with Lisa.  Among other things, he asked whether Lisa was "submissive" and had "ever been tied up and spanked," Hickey Aff. Ex. A at 2:58-2:59 p.m., said that Lisa "must be very tight," that he could "make [Lisa] cum over and over again" with "[his] cock, [his] finger, [his] tongue, a dildo, a vibrator," Hickey Aff. Ex. A at 3:02-3:04 p.m., asked whether Lisa's "breasts [had] developed yet," whether she had "big nipples," and whether she was "shaved," Hickey Aff. Ex. A at 3:05-3:06 p.m., and asked how Lisa "like[d] to cum" and whether she had "ever been penetrated by a cock," Hickey Aff. Ex. A at 3:14-3:16 p.m.

The defendant asked Lisa whether she was "looking for a guy to fool around with," said it was "natural," not "bad," for her to be doing so, and agreed that he was "looking for a girl 2 fo[o]l with."  (Hickey Aff. Ex. A at 3:21-3:22 p.m.).  He suggested that Lisa meet him, that he would "make a special trip" to New York City to see her, that he would "love to shoot on [Lisa's] 32c[ sized breasts]," and that they could

"have some fun together." (Hickey Aff. Ex. A at 3:22-3:33 p.m.). He suggested that they

meet on Friday; Lisa replied that "tuesday is kewl" because "grams back 2 work."

(Hickey Aff. Ex. A at 3:34 p.m.).

During the conversation, the defendant offered to "exchange pics," and

sent a picture of his face by e-mail to LisainNY05. (Hickey Aff. Ex. A at 3:07 p.m.; E-

mail from Stevewil160 to LisainNY05 on Nov. 23, 2005 at 3:11 p.m., Hickey Aff. Ex.

D). At the end of the conversation, he asked Lisa to "[l]ook at [his] pic when [she] rub[s]

[her]self," and he said he would send her a "cock pic" when he got home from work.

(Hickey Aff. Ex. A at 3:31-3:32 p.m.). That day, the undercover officer followed up on

that statement by sending an e-mail message, and the defendant replied to suggest that

they speak on November 25; the undercover officer also replied to that message. (E-mail

messages sent on Nov. 23, 2005 at 7:26 p.m. and Nov. 24, 2005 at 12:29 p.m. and 8:37

p.m., Hickey Aff. Ex. D.)

**B.      November 25, 2005, Chat Conversations, Phone Call, And E-mail**

The defendant next contacted law enforcement by instant message to

"LisainNY05" on Friday, November 25, 2005, at 12:39 p.m. (Instant message chat

conversation beginning on Nov. 25, 2005 at 12:39 p.m., Hickey Aff. Ex. E). Three

minutes into that conversation, the defendant asked Lisa whether she still wanted "to see

another pic of [him]," and Lisa replied, "sure." (Hickey Aff. Ex. E at 12:42 p.m.) Again,

the defendant asked Lisa whether she would masturbate while looking at his photo, and

he sent Lisa a picture of his penis at 2:46 p.m. that day. Hickey Aff. Ex. E at 12:45 p.m.;

E-mail from Stevewil160 to LisainNY05 on Nov. 25, 2005 at 2:46 p.m. (redacted),

Hickey Aff. Ex. D; Hickey Aff. Ex. B at 27:1-13.

It was in this chat conversation that the defendant first suggested that he would photograph Lisa:

> Stevewil160:   Too bad you don't have a pic to send me.
> . . . .
> LisainNY05:   i wish i had a pic 2
> LisainNY05:   i think u will like me
> Stevewil160:   *Maybe I could take a pic of you when we meet.*
> LisainNY05:   ok taht b kewl
> LisainNY05:   that way i will have on mayb u can send it 2 me
> Stevewil160:   sure
> Stevewil160:   I will take a face pic and one of those 32c's—lol

(Hickey Aff. Ex. E at 12:48-12:50 p.m. (emphasis added)).

After the defendant asked Lisa whether her grandmother was working on Tuesday and said he was "off" that day, he asked whether Lisa would "have the house to [herself]." (Hickey Aff. Ex. E at 12:52-12:53 p.m.). At that point, Lisa asked the defendant, "u wanna come here," and he said, "sure." (Hickey Aff. Ex. E at 12:53 p.m.). The conversation then became much more sexually explicit, at the defendant's initiation:

> Stevewil160:   I'm sure we can think of something to do--lol
> LisainNY05:   yes
> LisainNY05:   well you did say sum things u wanted to do
> LisainNY05:   u member
> Stevewil160:   Yes I do--lol
> Stevewil160:   DO you want to do them too?
> LisainNY05:   u still wanan do that stuff
> Stevewil160:   What stuff would you like to do?
> LisainNY05:   u know silly
> Stevewil160:   I want you to tell me
> LisainNY05:   u forgot?
> Stevewil160:   No, I just want to you to tell me.
> LisainNY05:   the sex stuff
> Stevewil160:   Yes, I know-- tell me what you want me to do to you.
> LisainNY05:   i never done any thing like this b4
> LisainNY05:   well i did sex things but not type about it lol
> Stevewil160:   What have you done then?
> Stevewil160:   You can say it to me
> LisainNY05:   i had a bf i told u tat right
> . . . .

LisainNY05:   ok well we did bf n gf things hehehe

(Hickey Aff. Ex. E at 12:54-1:00 p.m.).  The defendant sought more detail, asking Lisa,

"Did he ever lick your clit?", "Do you like having your nipples sucked?", "Do you like

being penetrated by a nice cock?", and "Do you get very wet?"  (Hickey Aff. Ex. E at

1:00-1:04 p.m.).  When Lisa responded "yes" to the last question, the defendant said, "it

should slide in very easy," and the next question he asked her was, "What part of

Manhattan do you live?" (Hickey Aff. Ex. E at 1:04-1:05 p.m.).   The defendant offered

to meet Lisa "downstairs in front of [her] building," but Lisa suggested that they meet on

the nearby corner of Avenue A and Houston Street.  (Hickey Aff. Ex. E at 1:10-1:11

p.m.).  At that point, Lisa reminded the defendant that she was 13, and she asked if that

was okay.  He replied, "ok."  (Hickey Aff. Ex. E at 1:11-1:13 p.m.).

        The defendant contacted "LisainNY05" by instant message later that same

day, around the time that he sent her a picture of his penis.  (Instant message chat

conversation beginning on Nov. 25, 2005 at 2:45 p.m., Hickey Aff. Ex. F).  The

defendant asked Lisa if the picture of his penis made her "a little horny," whether she was

"wet down there" and whether her "nipples [were] hard."  (Hickey Aff. Ex. F at 2:47-

2:49 p.m.)  He also said that he "would be really hard if [he] had a pic of [Lisa]," to

which she replied, "u wiill have 1 tuesdsy."  (Hickey Aff. Ex. F at 2:50 p.m.).  At that

point, the defendant suggested that Lisa speak to him over the phone, and a different

undercover officer, Detective Ann Psomas, called the number the defendant provided.

(Hickey Aff. Ex. F at 2:51-2:52 p.m.)

        During the phone conversation, the defendant and Lisa discussed where to

meet on Tuesday.  The defendant first alluded to the meeting by asking, "And, uh, you

said that there's a, uh, park?" (Draft transcript of phone conversation on Nov. 25, 2005, at 3:5, Hickey Aff. Ex. G). The defendant asked Lisa whether she wanted to ask him anything, and whether she was "okay with meeting," and when she said she thought he was "nice," he asked whether on "Tuesday . . . Gram will be working." (Hickey Aff. Ex. G at 4:16-5:11). At that point, Lisa confirmed, "You want to come here, right?" (Hickey Aff. Ex. G at 5:14). The defendant also warned Lisa to "be very careful with [his] pic," because "you're not really supposed to send that stuff over the internet." (Hickey Aff. Ex. G at 6:14-6:18).

During the conversation, Lisa asked the defendant whether he would be back online after their phone conversation, and he said he would. (Hickey Aff. Ex. G at 6:7-8, 8:11-12). After they hung up, the defendant again contacted Lisa by instant message. (Instant message chat conversation beginning on Nov. 25, 2005 at 3:19 p.m., Hickey Aff. Ex. H). He pressed Lisa to discuss in explicit terms the sexual acts she performed with her boyfriend: "I like you to say it. When you said it, it means you are not ashamed of it." (Hickey Aff. Ex. H at 3:27 p.m.). The defendant then turned the conversation to the sexual acts he would like to perform with Lisa, including ejaculating on her breasts and having Lisa masturbate while on the phone with him. (Hickey Aff. Ex. H at 3:30-3:34 p.m.).

It was also in this conversation that the defendant once again raised the possibility of taking sexually explicit pictures of Lisa, including one of her vagina:

```
Stevewil160:   So. I will bring my digital camera
LisainNY05:    ok kewl
LisainNY05:     thast good i need pic
Stevewil160:   A nice face shot
LisainNY05:    yup
LisainNY05:    for on here
```

```
Stevewil160:   And the other shots are for me–lol
LisainNY05:    only u
Stevewil160:   yes
LisainNY05:    u meen the bbob pic right
Stevewil160:   right
LisainNY05:    ok
Stevewil160:   would you like me to take a pic of your you know what?
LisainNY05:    my cooch?
Stevewil160:   yes
LisainNY05:    do you want 1
LisainNY05:    of that
Stevewil160:   sure
LisainNY05:    what wood u do with thtat
Stevewil160:   the same thing i would get out of a boob pic
```

(Hickey Aff. Ex. H at 3:39-3:42 p.m.).

**C.    November 26-27, 2005, Chat Conversations And E-mail**

The defendant next contacted Lisa by instant message on Saturday,

November 26, 2005, at 2:56 p.m. (Hickey Aff. Ex. I).  In that short conversation, the

defendant asked Lisa if she was looking forward to their meeting on Tuesday.  She said

that she thought it would be "sooooo much fun"; the defendant said he would make her

"feel very good," and that he was sure that Lisa would "make [him] feel good too–lol,"

and that he would teach her how, so she would "be experienced."  (Hickey Aff. Ex. I at

3:00-3:04 p.m.)

The defendant e-mailed Lisa on Sunday, November 27, 2005, and she

replied.  (Hickey Aff. Ex. D).

**D.    November 28, 2005, Chat Conversation And E-mail**

The defendant contacted Lisa again by e-mail the following morning, and

suggested they talk more online and over the phone, prior to their meeting.  (E-mail from

Stevewil160 to LisainNY05 on Nov. 28, 2005 at 10:24 a.m., Hickey Aff. Ex. D).  Later

that afternoon, Lisa sent the defendant an e-mail to let him know that she might not be

online that day, but that she would call him the next day, prior to their meeting, and, upon

receiving the e-mail, the defendant immediately contacted Lisa by instant message. (E-

mail from LisainNY05 to Stevewil160 on Nov. 28, 2005 at 3:24 p.m., Hickey Aff. Ex. D;

Instant message chat conversation beginning on Nov. 28, 2005 at 2:30 p.m., Hickey Aff.

Ex. J).[1] In that conversation, the defendant and Lisa confirmed that they would meet at 4

p.m. the following day near the dog run in Tompkins Square Park, and that she would

call the defendant from school to confirm.  The defendant also asked Lisa to masturbate

that night, so that she would "be really horny for tomorrow."  (Hickey Aff. Ex. J at 2:34

p.m.).  Later that night, the defendant sent LisainNY05 an e-mail, repeating that request

so that she would be "nice and wet for tomorrow," and she replied by e-mail that she was

"xcited" about their meeting the following day.  (E-mail exchange on Nov. 28, 2005,

Hickey Aff. Ex. D).

**E.      November 29, 2005 Phone Call And In-Person Meeting**

        The female undercover officer posing as Lisa, Detective Ann Psomas,

called the defendant at about 1:12 p.m. on Tuesday, November 29, 2005, to confirm their

meeting, although the place of the meeting was changed back to the corner of Houston

Street and Avenue A.  (Draft transcript of phone conversation on Nov. 29, 2005, Hickey

Aff. Ex. K).

        The defendant and Detective Psomas, in her undercover capacity as Lisa,

met as planned at the corner of Avenue A and Houston Street at approximately 4 p.m.

that day.  Shortly after they met, the defendant asked Lisa whether she did "that thing last

---

[1]        Although the header of the e-mail suggests that it was sent at 3:24 p.m., the return
receipt for the e-mail, which appears on the following page of Exhibit D, indicates that it
was actually sent at 2:24 p.m. and read at 2:29 p.m., seconds before the chat conversation
began.

night," i.e., masturbate. (Draft transcript of recorded, in-person meeting on Nov. 29, 2005 at 5:19-20, Hickey Aff. Ex. L). A short time later, in the following exchange, the defendant suggested that they walk to retrieve the camera that he had left in his car:

| | |
|---|---|
| MUSUMECI: | I know, besides the park—see, I, I didn't know that there would be, like, parking over here, so I parked, like, three blocks down or something where there was no meters. |
| UC: | Oh, yeah? You parked that way? |
| MUSUMECI: | Yeah. |
| UC: | Oh, did you, like, bring the camera? |
| MUSUMECI: | Yeah, but I left it in the car. |
| UC: | Oh, you left it in the car? |
| MUSUMECI: | Yeah. |
| UC: | And it's far away? |
| MUSUMECI: | Uh, it's about a couple of blocks away. |
| UC: | Oh, okay. |
| MUSUMECI: | You want to take walk and go get it? Or— |
| UC: | We can go get it. |
| MUSUMECI: | Yeah, okay. Alright, good. I parked right by the school. |

(Hickey Aff. Ex. L at 7:10-24). Moments later, the undercover officer asked the defendant what he wanted to do first, and he replied, "Well, you know, we'll go get the camera. And uh, I guess then if everything is ok with you, we'll go upstairs." He added, "As long as Gram's not coming home too soon." (Hickey Aff. Ex. L at 8:18-21). When the defendant said that "this way [Lisa could] take a nice pretty face picture and put it on the computer," she asked, "Is that all we're gonna take pictures of?" and the defendant answered, "No." (Hickey Aff. Ex. L at 9:4-7).

During the next half-hour, the defendant and the undercover officer walked to where he parked, near Avenue C and East 5th Street, retrieved a Polaroid camera, and then went to 20 Avenue A. As they walked, for the third time the undercover officer told the defendant she was a minor:

| | |
|---|---|
| UC: | I think it's cool though that you came though and I like that, you know, you don't care I'm 13 and stuff, and you didn't get mad at me. |
| MUSUMECI: | Well I, I care a little bit, but I'm not going to do anything to get you into trouble, so you don't have to worry. |
| UC: | Okay, cool. |
| MUSUMECI: | You certainly don't look it. |
| UC: | Oh, thanks.  That's good.  'Cause my mom and dad and my grandma will all kill me and then I probably wouldn't be able to stay here and— |
| MUSUMECI: | Well, they'd kill you and then they'd kill me. (Laughs.) |

(Hickey Aff. Ex. L at 23:24-24:7).

     The defendant was arrested as he and the undercover officer entered the

building where the undercover officer said she lived with her grandmother.

## III.  ARGUMENT

**A.     The Defendant Must Produce Evidence The Government Induced Him To Commit A Crime He Was Not Predisposed To Commit Before He Is Entitled To An Entrapment Defense**

Entrapment is an affirmative defense, and in the first instance, the defendant bears the burden of proving, by a preponderance of the evidence, that he is entitled to a jury instruction on that defense.  *United States* v. *Brand*, 467 F.3d 179, 189-90 (2d Cir. 2006); *see also United States* v. *Williams*, 23 F.3d 629, 635 (2d Cir. 1994) ("Entrapment is an affirmative defense that requires a defendant to prove by a preponderance of the evidence the [G]overnment's inducement to commit the crime").  The defense has two elements: "(1) [G]overnment inducement of the crime, and (2) lack of predisposition on the defendant's part."  *United States* v. *Bala*, 236 F.3d 87, 94 (2d Cir. 2000) (internal quotation marks omitted).

A defendant arguing entrapment must first produce "credible evidence of [G]overnment inducement."  *Id.*  Inducement includes "soliciting, proposing, initiating, broaching or suggesting the commission of the offense charged," or, to put it another way, "a defendant must establish that [it was] the prosecution [that] set the accused in motion."  *Brand*, 467 F.3d at 190 (internal quotation marks omitted; alterations in original).  While the burden of showing inducement may be "relatively easily satisfied," it "should not be treated as a hollow requirement," and the defendant must do more than "simply point to the [G]overnment's use of an undercover agent."  *Id.*  The mere fact that the Government provided the opportunity to engage in a crime does not mean there was inducement; to be entitled to a jury instruction on entrapment, the defendant must "present not just a smattering or a scintilla of evidence of government inducement, but

substantial evidence that it was the Government that was responsible for the formation of" the defendant's criminal intent. *United States* v. *Ogle*, 328 F.3d 182, 187 (5th Cir. 2003).

If a defendant meets his burden of showing the Government induced him to commit the offense, the Government bears the burden of proving beyond a reasonable doubt "predisposition on the defendant's part." *Bala*, 236 F.3d at 94. Predisposition may be shown by evidence of: "'(1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement.'" *Id.* (quoting *United States* v. *Valencia*, 645 F.2d 1158, 1167 (2d Cir. 1980)). With respect to the third type of evidence, a defendant is predisposed to commit a crime if he is "ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity." *United States* v. *Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) (citations omitted). Importantly, then, the Government may prove predisposition solely by reference to the defendant's conduct in the course of the charged offense.

Where the Government's evidence of predisposition is uncontroverted, the defendant is precluded from offering an entrapment defense. *See United States* v. *Hurtado*, 47 F.3d 577, 585 (2d Cir. 1995) ("If the government . . . presents uncontradicted proof of predisposition, the entrapment defense is precluded as a matter of law."); *United States* v. *Mayo*, 705 F.2d 62, 68 (2d Cir. 1983) ("[T]he entrapment defense will not go to the jury in the face of substantial evidence of propensity unless the defendant produces some evidence to contradict directly the prosecution's showing.").

**B.      The Defendant Should Be Precluded From Arguing Entrapment Unless He Can Proffer A Factual Basis For Pursuing Such A Defense.**

It is well settled that, "[u]pon a proper request, a defendant is entitled to a jury instruction on any defense theory for which there is a foundation in the evidence, even if the trial court determines that the evidentiary foundation of the defense theory is only tenuous." *United States* v. *Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citations omitted).  It is equally well-established, however, that a court may conduct a pre-trial evidentiary hearing "to determine whether a defense fails as a matter of law." *Id.*; *see also United States* v. *Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990) (approving the use of a pre-trial hearing to determine whether the evidence of duress or coercion was sufficient to raise a jury issue or whether it failed as a matter of law).  "If, after the hearing, the court finds that the defendant's evidence is insufficient as a matter of law to establish the defense, the court is under no duty to give the requested jury charge or to allow the defendant to present the evidence to the jury." *Paul*, 110 F.3d at 871.  In this case, the defendant can offer no credible evidence in support of either element of the entrapment defense, namely, (i) that he was induced by the Government; or (ii) that he lacked a predisposition to commit the charged offense.

With respect to the element of inducement, there can be no serious dispute that: (i) the defendant initiated all of the internet chats with Lisa; (ii) the defendant steered the conversation to sexual topics, and pressed Lisa to be more sexually explicit about her sexual experience and desires, as he did the same; (iii) the defendant proposed the idea of meeting with Lisa and engaging in sexual acts, including phone sex, oral sex, sexual intercourse, and taking sexually explicit photographs of her breasts and vagina; and (iv) when they met, the defendant suggested returning to his car to retrieve the

- 14 -

camera and then going to the apartment where Lisa lived. The defendant "not only

initiated the conversation, but also first broached the topics of sex and meeting in

person," and as the conversations progressed, the defendant's comments "became more

detailed, while [Lisa] merely responded to [his] statements and questions" regarding her

sexual experience and his sexual desires. *United States* v. *Munro*, 394 F.3d 865, 869

(10th Cir. 2005). Thus far, at least, there is insufficient evidence of inducement to

warrant an entrapment instruction. *Id.* at 871.

        Although the undercover officers agreed to the defendant's suggestions,

on occasion encouraged future communications from the defendant, and at times

followed up to confirm that he still wanted to meet, have sex, and take sexually explicit

photographs, questions regarding or responses to suggestions that the defendant made

earlier did not induce the defendant to do anything he had not already proposed, because,

under those circumstances, it was not "the prosecution [that] set the accused in motion."

*Brand*, 467 F.3d at 190 (internal quotation marks omitted). To the contrary, questions

about whether the defendant intended to follow through on his stated criminal plans, such

as when the undercover officer asked whether the camera was too far away to retrieve,

Hickey Aff. Ex. L at 7:19-24, gave the defendant the opportunity to "back out," and that

opportunity "vitiat[es] the need for an entrapment instruction," *Munro*, 394 F.3d at 871-

72. Moreover, questions by undercover officers that followed up on the defendant's prior

suggestions (but did not enlarge on them) were a natural part of the undercover operation,

because, in addition to allowing the defendant the opportunity to either disclaim criminal

intent or press forward, they created the impression that Lisa was a real minor who was

interested in the sexual activity that the defendant had suggested. They were, in other

- 15 -

words, part of the "[a]rtifice and strategem [that] may be employed to catch those

engaged in criminal enterprises, [and] that the government employed either does not

necessarily mean that it was the government that initiated the crime." *Brand*, 467 F.3d at

190 (internal quotation marks and citations omitted).

        As to the element of predisposition, the evidence is equally clear. The

defendant was in a chat room labeled "I love older men," or something similar, and he

contacted an individual whose profile suggested that she was a minor. *See Brand*, 467

F.3d at 194 ("As an initial matter, we note that the manner in which Brand contacted both

'Sarah' and 'Julie'---specifically, in an Internet chat room entitled 'I Love Older Men'---

does bear on Brand's predisposition. He did not encounter them until he had chosen to

log onto a chat room with a very suggestive name."). Instantly, Lisa indicated she was 13

years old, *see id.*, an age she repeated again in another chat conversation and during their

meeting. Notwithstanding that, the defendant repeatedly pressed Lisa to discuss her

sexual interests and experience in explicit terms, and at no point during his interaction

with undercover officers over nearly a week did the defendant express any hesitation

whatsoever about meeting Lisa, having sex with her, or photographing her. *See Brand*,

467 F.3d at 195.

        In the absence of any proffer by the defendant evidencing either

inducement or a lack of predisposition, he should be precluded from making an

entrapment argument to the jury at trial. *See Hurtado*, 47 F.3d at 585; *Mayo*, 705 F.2d at

68. Without a factual basis from which to argue entrapment, there is a very realistic

concern that the defendant's attempt to assert this defense at trial (in the opening

statement and on cross-examination, for example) may prejudice and confuse the jury,

particularly if no entrapment charge is ultimately given by the Court. Accordingly, the Government requests the Court to preclude the entrapment defense, unless the defendant is first able to proffer a specific factual basis for asserting the defense at trial.

Should the Court deny the above motion precluding the defendant from arguing entrapment without a factual proffer, the Government respectfully requests a ruling that, if the evidence adduced at trial fails to support an entrapment charge, the Court will instruct the jury that entrapment is not a defense in this case. A defendant's failure to elicit facts to support an entrapment charge generally results in a court not issuing such a charge to the jury. There is a concern, however, that if the defendant argues entrapment, yet fails to adduce facts entitling him to an entrapment charge, the jury would be confused as to whether entrapment was a legally proper defense. Accordingly, the Government requests that, should the defendant fail to make a showing at trial in support of such a charge, the Court should issue the following curative instruction:

> There has been some mention in this trial about entrapment. Entrapment is a complicated legal doctrine, but it has nothing at all to do with this case. I am instructing you as a matter of law that entrapment is not a defense in this case and you are not permitted to consider it during your deliberations.

The proposed charge is adapted from the charge given last year by the Honorable Paul A. Crotty in *United States* v. *McDarrah*, No. 05 Cr. 1182 (PAC) (S.D.N.Y. Dec. 19, 2006).

- 17 -

## III.  CONCLUSION

Accordingly, for the reasons stated above, the Court should exclude the any entrapment defense by the defendant in the absence of a factual proffer justifying the defense or, in the alternative, grant the Government a curative instruction that entrapment is not a defense in this case, should the defendant pursue an entrapment defense at trial without ultimately establishing the proper factual basis of Government inducement or creating a genuine issue of fact as to the defendant's propensity.

July 13, 2007

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:

Adam S. Hickey
Assistant United States Attorney
Southern District of New York
Tel.: (212) 637-1039

- 18 -