UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      v.

JEFFREY MUSUMECI,

           Defendant.

Case No. 07-cr-402 (RMB)

**JEFFREY MUSUMECI'S REPLY IN FURTHER SUPPORT OF HIS MOTION
FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

**BRAFMAN & ASSOCIATES, P.C.**
*Attorneys for Jeffrey Musumeci*
767 3rd Avenue, 26th Floor
New York, New York 10017
Tel: (212) 750-7800
Fax: (212) 750-390

Federal inmate Jeffrey Musumeci (Register # 59877-054), through undersigned counsel, files this reply in further support of his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) (*see* ECF Doc. 52). For the reasons set forth below, the Court should order that: (1) Jeffrey's prison sentence be reduced to time served; (2) he be immediately released from prison; (3) he be subject to supervised release until January 11, 2021 (his projected prison release date) with conditions that include GPS-monitoring home confinement at ▓▓▓▓▓▓▓▓ Smithtown, NY 11787 (his daughter's home, which has already been approved by Probation) and quarantining for the first 14 days from release in the basement of that home; and (4) his original five-year supervised release term begin on January 11, 2021.

In the alternative, Jeffrey moves for an order that be immediately released from prison and serve the remainder of his prison sentence at Brooklyn House Residential Reentry Center, where he will self-quarantine for the first 14 days from his release from prison. In the second alternative, Jeffrey moves for an order recommending that the Federal Bureau of Prions ("BOP") immediately release him to Brooklyn House.

Given the Court's 10-page limit for reply memoranda of law, Jeffrey incorporates by reference the statements he made in his BOP petition, which was sent to FCI Allenwood Low's warden on April 20, 2020, and which is docketed at ECF Doc. 55-1. (*See* Ex. 1 (Proof of Filing)).

**I.    This Court Should Excuse Jeffrey's Failure to Exhaust His Administrative Remedies**

The Government argues that, "[b]ecuase exhaustion is mandatory, the Court lack the authority to grant compassionate release at this time." (ECF Doc. 55 (Resp.)). But the Government overlooks that the "plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989)

(brackets and internal quotation marks omitted). "In such cases, the intention of the drafters, rather than the strict language, controls."[1] *Id.*

Under the so-called "absurdity canon," the Court should waive the exhaustion requirement here. Section 3582(c)(1)(A)'s legislative history shows that the provision allowing inmates to file compassionate release motions was implemented to "enhance [the] safety" of the inmate, BOP guards, and the public and to "increase the use and transparency of compassionate release." *United States v. Scparta*, No. 18-cr-578, 2020 WL 1910481, at 7 (S.D.N.Y. Apr. 20, 2020) (Nathan, J.) (internal quotation marks omitted); *United States v. Zukerman*, No. 16-cr-194, 2020 WL 1659880, at 3 (S.D.N.Y. Apr. 3, 2020) (Torres, J.) (internal quotation mark and brackets omitted);

When § 3582(c)(1)(A) was implemented, Congress did not anticipate a pandemic that would cause the BOP to be swamped with various requests and be unable to decide § 3582(c)(1)(A) petitions within 30 days of filing. *See United States v. Haney*, No. 19-cr-541, 2020 WL 1821988, at 3 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.) ("Congress cannot have intended the 30-day waiting period of § 3582(c)(1)(A) to rigidly apply in the highly unusual situation in which the nation finds itself today."). Thus, "Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually favors such waiver, allowing courts to deal with the emergency before it is potentially too late." *Id.* at 3–4.[2]

---

[1] *See also McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("Of paramount importance to any exhaustion inquiry is congressional intent." (internal quotation marks omitted)); *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012) ("We turn to the legislative history only when the plain statutory language is ambiguous or would lead to an absurd result." (internal quotation marks omitted)).

[2] Courts that have appropriately resorted to § 3582(c)(1)(A)'s legislative history in COVID-19 cases have waived the exhaustion requirement. *See, e.g.*, *Scparta*, 2020 WL 1910481, at 5 ("Because the 30-day rule was meant as an accelerant to judicial review[,] it would pervert congressional intent to treat it as a substantial obstacle to effective judicial review." (internal quotation marks and ellipsis omitted)); *United States v. Russo*, No. 16-cr-441, 2020 WL 1862294, at 6 (S.D.N.Y. Apr. 14, 2020) (Liman, J.) ("It would be ironic, and certainly inconsistent with congressional intent, for the thirty days

2

The Government appears to concede that the exhaustion requirement should be waived if the canon of absurdity were to be applied. (See Resp. at 8 ("COVID-19 present unusual circumstances, in which compassionate release decision should be made expeditiously.")).

The Government cites several opinions in support of its exhaustion argument. (Resp. at 6–8 & n.4). But those opinions are inapposite, because the absurdity canon was not raised by the parties in those cases and thus was not an issue before the courts.

The Government asserts that "[i]nformed decisions about compassionate release require the collection of information, like disciplinary records and medical history, that the BOP is uniquely situated to obtain and which will benefit both the BOP and later the court [in] evaluating such claims." (Resp. at 9). But the Government has already obtained Jeffrey's medical records and submitted them to the Court. (Resp., Exs. 2–3). And the Government was able to obtain Jeffrey's medical records from the BOP in less than a day[3] and could obtain any other records that would enable the Court to make an "informed decision."[4]

## II.  Extraordinary and Compelling Circumstances Warrant Compassionate Release

### A.  Jeffrey's Medical Conditions

The Government does not dispute Jeffrey's position that his advanced age of 66 and various medical conditions (including ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇) put him at high risk of severe illness from COVID-19. (See ECF Doc. 55-1 at 2–3, 5; Resp., Exs. 2–3).

---

to serve as a substantial obstacle to effective judicial relief."); *Zukerman*, 2020 WL 1659880, at 3 ("[A]dministrative exhaustion would defeat, not further, the policies underlying § 3582(c).").

[3] During a phone call between the undersigned and AUSA Thomas Burnett on the afternoon of April 23, 2020, the prosecutor said that he was going to try to obtain Jeffrey's medical records from the BOP. At 11:53 A.M. on April 23, 2020, the prosecutor filed Jeffrey's BOP medical records.

[4] Insofar as the Court finds that the exhaustion requirement precludes the Court from granting compassionate release, Jeffrey requests that the Court issue an order recommending that the BOP immediately grant his § 3582(c)(1)(A) petition.

The Government argues that Jeffrey does not satisfy the requirements of U.S.S.G. § 1B1.13 Application Note 1(A) ("Medical Condition of the Defendant") or (1)(B) ("Age of the Defendant"). (Resp. at 10). But the Government overlooks Application Note 1(D), which "authorizes release based on 'an extraordinary and compelling reason other than, or in combination with, the other reasons described.'" *Perez*, 2020 WL 1546422, at 4 (quoting U.S.S.G. § 1B1.13 Application Note 1(D)) (brackets omitted); *see also United States v. Resnick*, No. 14-cr-810, 2020 WL 1651508, at 7 (S.D.N.Y. Apr. 2, 2020) (McMahon, C.J.) ("Resnick's high susceptibility to COVID-19 falls within the purview of [Application Note 1's] catchall [provision].").

The Government notes that Jeffrey's medical records "suggest" that his medical conditions "are under control." (Resp. at 11–12). But Jeffrey is seeking compassionate release based on the combination of the COVID-19 pandemic and his medical conditions. *See Scparta*, 2020 WL 1910481, at 9 ("[T]he Court rejects the Government's contention that Mr. Scparta['s] general good health before the pandemic speaks to whether he should now be released. . . . [His] purported good health months ago does not immunize him now from serious risk—and even death—from contracting COVID-19."); *United States v. Gross*, No. 15-cr-769, 2020 WL 1862251, at 3 (S.D.N.Y. Apr. 14, 2020) (Nathan, J.) ("[T]he combination of the COVID-19 pandemic and Mr. Gross's health conditions constitutes an extraordinary and compelling reason[.]").

  B.  **The BOP's COVID-19 Action Plan**

The Government asserts that Jeffrey "does not claim that extending his time at Allenwood while awaiting transfer to a [residential reentry center] increases his risk of contracting COVID-19." (Resp. at 12). The Government is wrong. (*See* ECF Doc. 55-1 at 5 ("[T]he BOP's 'COVID-19 Action Plan' is inadequate in preventing the virus from spreading to Jeffrey's prison and infecting him." (footnote omitted))).

4

The Government asserts that "Allenwood, like all BOP facilities, has also implemented an aggressive action plan to prevent an outbreak." (Resp. at 12). But the BOP's "action plan" is not "aggressive" enough, because the rate of COVID-19 infections for BOP inmates is much higher than the infection rate for residents in the United States, China, and Italy.[5]

The Government points out that Allenwood has "no confirmed cases of the virus." (Resp. at 12). But Jeffrey is seeking to get released before it is too late—before COVID-19 spreads to his prison and infects him. Moreover, there could very well be staff members or inmates at Jeffrey's prison who already have COVID-19. *See Scparta*, 2020 WL 1910481, at 3 (stating that people who have COVID-19 "may not show any symptoms for days" and that COVID-19 testing is "severely limited" in BOP facilities); *Valentine v. Colier*, No. 20-cv-1115, 2020 WL 1916883, at 4 (S.D. Tex. Apr. 20, 2020) (stating that COVID-19 has a "long incubation period" and "spreads easily through prison environments").

### C. The BOP's SHU-Quarantine Requirement

The BOP is requiring Jeffrey to quarantine in a SHU cell for 14 straight days before his release.[6] However, he cannot go into the SHU—he would suffer panic attacks given his ███████ ████████ and be unable to eat most of the SHU meals given his ████████████████.[7] (*See* ECF Doc. 55-1 at 2–3, 6). The BOP is categorically applying the SHU-quarantine requirement on Jeffrey without considering his unique medical conditions. *See Scparta*, 2020 WL

---

[5] *See* https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.4.22.pdf.

[6] Jeffrey has told the undersigned that his unit manager (Mr. Coombe) had told him several times that FCI Allenwood Low recently lifted the SHU-quarantine requirement. Additionally, Mr. Coombe told Jeffrey (without explanation) that his original April 29, 2020, release date could not be reinstated. The undersigned has been unable to reach Mr. Coombe to confirm Jeffrey's representations.

[7] When Jeffrey was placed in the SHU in 2016 before undergoing an ████████████ he had a panic attack after only spending one day in the SHU. Although Jeffrey has been in need of another ████████████ since 2018, he is refusing to get one in order to avoid the SHU.

5

1910481, at 3 ("FCI Butner has not been exercising case-by-discretion as to whether inmates should be released to a 14-day quarantine prior to release. Instead, the BOP instructed FCI Butner staff to place all inmates being released to home confinement into quarantine 14 days prior to their scheduled transfer date." (record citation and internal quotation marks omitted)).

The Government argues that "the BOP's rational efforts to guard against the spread of COVID-19" overcome Jeffrey's "desire to avoid separated housing" and "dismay that the alternative is spending an additional two months to Allenwood." (Resp. at 10). But the Government fails to show that COVID-19 will spread if Jeffrey were to quarantine for 14 days in his daughter's basement and otherwise follow his proposed release plans (which are set forth on pages 6–7 of his BOP petition, ECF Doc. 55-1). *See Resnick*, 2020 WL 1651508, at 7 ("[A]ny reservations this court may have had about Resnick's being a possible spreader of COVID-19 if released into the community has been assuaged by the release plan he has proffered.").

Moreover, the Government fails to explain why the BOP would not release Jeffrey if he were to test negative for COVID-19. Insofar as COVOID-19 testing is not available at Jeffrey's prison, the BOP could monitor him for 14 days and release him if he shows no COVID-19 symptoms and his body temperature remains below 100.4 degrees Fahrenheit.[8]

Finally, the SHU-quarantine requirement may be in place on June 25, 2020. Thus, Jeffrey may spend many months (and perhaps years) in prison beyond his initial release date of April 29, 2020, and his current release date of June 25, 2020, just because of the BOP's blanket SHU-quarantine requirement. *See Scparta*, 2020 WL 1910481, at 9 ("Although the Bureau of Prisons

---

[8] In the case of an inmate's potential transfer to another facility, "the inmate will be transferred" if he is screened for COVID-19 symptoms and "has no symptoms and a temperature less than 100.4 degrees F." https://www.bop.gov/coronavirus/covid19_status.jsp. If the BOP thinks that it is safe to do an inmate transfer under such circumstances, it is perplexing why the BOP would not release Jeffrey under such circumstances, especially if he is willing to be monitored for 14 days.

has determined that Mr. Scparta is eligible for home confinement, the Court is not confident that he will ever actually obtain that relief, due to the BOP's so-called quarantine policy.").

In sum, FCI Allenwood Low's apparent SHU-quarantine requirement should not be a reason for the Court to deny compassionate release. In fact, the SHU-quarantine requirement is a reason for the Court to grant Jeffrey's immediate release to home quarantine, because the conditions at his daughter's home "will be significantly better than [FCI Allenwood Low], where despite the BOP's best efforts, [he] is constantly at risk from contamination both from within and without the prison walls, and where access to PPE [personal protective equipment] for inmates is essentially non-existent." *Resnick*, 2020 WL 1651508, at 8;[9] *see also Scparta*, 2020 WL 1910481, at 2, 9 ("[I]t is undisputed that [the defendant, under home confinement,] can safely distance from members of his family and the public and receive medical care if necessary. . . . [D]elaying [his] release for any period of time in the name of a so-called quarantine . . . only furthers the danger to [him] as well as the public health of the community at large."); *United States v. Lowry*, No. 18-cr-882, 2020 WL 1674060, at 3 (S.D.N.Y. Apr. 6, 2020) (Swain, J.) ("[The defendant's] release to home quarantine is consistent with the protection of the health of the general public and with the BOP's efforts to address COVID-19 by prudently reducing the population of its facilities.").[10]

---

[9] In *Resnick*, Judge McMahon ordered the defendant's immediate release from Devens FMC to home quarantine. 2020 WL 1651508, at 8. When that order was issued on April 2, 2020, there were no confirmed COVID-19 cases at Devens FMC. *See* https://www.fd.org/sites/default/files/covid19/bop_jail_policies_and_information/bop_updates.pdf. Not surprisingly, COVID-19 has since spread to Devens FMC. *See* https://www.bop.gov/coronavirus/.

[10] *See also United States v. Kataev*, No. 16-cr-763, 2020 WL 1862685, at 4 (S.D.N.Y. Apr. 14, 2020) (Schofield, J.) (ordering that the defendant be immediately released from prison to home quarantine); *United States v. Sawicz*, No. 08-cr-287, 2020 WL 1815851, at 4 (E.D.N.Y. Apr. 10, 2020) (Ross, J.) ("Defendant . . . shall not spend 14 days in quarantine at FCI DANBURY prior to his release, but shall be released immediately upon the institution's receipt of this Order, and shall instead spend 14 days in quarantine at the place he shall reside."); *Colvin*, 2020 WL 1613943, at 4 ("In light of the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, the Court concludes that the risks faced by Defendant will be minimized by her immediate release to home,

**D.     Jeffrey's Release to Home Confinement Versus Halfway House**

Jeffrey would not be safe from COVID-19 if he were released to Brooklyn House (or any other halfway house). The BOP reports that, as of April 23, 2020, two Brooklyn House residents have COVID-19.[11] News outlets have reported that four Brooklyn House residents have COVID-19, and "it is likely that [the facility] has many more inmates with coronavirus, as some inmates were reported to be very sick and were sleeping with cold medicine bottles next to their beds."[12]

Residents of Brooklyn House (and other halfway houses) have reported that "vulnerability to coronavirus is high"; for example, Brooklyn House (1) has 160 residents, who "sleep in bunk beds about three feet apart in rooms that house between four and 20 people, but has "not made any changes to this setup in response to the outbreak"; (2) "is refusing to test any more of its inmates even the ones exhibiting symptoms"; (3) has had one COVID-19 resident who has "use[d] the same communal bathroom and telephone"; (4) is on lockdown, forcing the residents to live together in the facility's "tight quarters"; and (5) has staff members who "enter[] and exit[] the facility every few minutes."[13]

---

where she will quarantine herself. Continued exposure to the large population of FDC Philadelphia over the coming weeks would impose upon Defendant additional, unnecessary health risks which can be minimized by her early release.").

[11] *See* https://www.bop.gov/coronavirus/. The BOP's website refers to "Brooklyn House Core Services Group, Inc. (RRC)," which runs Brooklyn House.

[12] *See, e.g.*, https://www.kingscountypolitics.com/covid-19-brooklyn-queens-update-04-02-2020/.

[13]    https://theappeal.org/halfway-house-residents-describe-a-scary-situation-as-coronavirus-sweeps-the-u-s/;    https://www.nydailynews.com/coronavirus/ny-coronavirus-brooklyn-house-residential-reentry-center-sick-inmates-20200401-eyua7fugqfetnmpfeije7sg6ve-story.html; https://www.kingscountypolitics.com/covid-19-brooklyn-queens-update-04-02-2020/; *see also* https://bass.house.gov/media-center/press-releases/after-rising-numbers-federal-prisoners-test-positive-covid-19-first (citing "several stories of elderly and vulnerable inmates who are residing in close-quarters in residential reentry centers").

Given the high risk of contracting COVID-19 at Brooklyn House, Jeffrey should be released to home confinement. *See United States v. Campagna*, No. 16-cr-78, 2020 WL 1489829, at 1, 3 (S.D.N.Y. Mar. 27, 2020) (Schofield, J.) (releasing the defendant from Brooklyn House to home confinement).[14]

### E.      The § 3553(a) Factors Weigh/Militate in Favor of Compassionate Release

Although Jeffrey's crimes were serious, the § 3553(a) factors do not "outweigh the 'extraordinary and compelling reasons' warranting compassionate release." *See United States v. Ebbers*, No. 02-cr-1144, 2020 WL 91399, at 7 (S.D.N.Y. Jan. 8, 2020) (Caproni, J.). Jeffrey, who has not violated any prison rules, has been in prison for more than 12 years, has served roughly 80% of the imposed prison sentence, and his original April 29, 2020, release date is just a few days away; thus, ordering his immediate release "will not prevent him from being adequately punished nor will it discount the seriousness of his offense or diminish the message that his crimes were unacceptable." *See id.* at 8. Moreover, Jeffrey "will face challenges in caring for himself" if he were to get COVID-19 in prison, *see Gross*, 2020 WL 1862251, at 3, and his "home confinement will meaningfully restrict his freedom of movement," *see United States v. Hernandez*, No. 18-cr-834, 2020 WL 1684062, at 3 (S.D.N.Y. Apr. 2, 2020) (Engelmayer, J.).

Indeed, even before the start of the COVID-19 pandemic, the Court determined that the § 3553(a) factors warrant Jeffrey's early release from prison. (ECF Doc. 49 (1/15/2020 Order)).

In arguing that "the § 3553(a) factors weigh against granting Musumeci early release," the Government notes that Jeffrey was originally sentenced below the Guidelines range to the mandatory minimum. (Resp. at 13). The Government is conflating issues. When Jeffrey was

---

[14] A Brooklyn House representative told the undersigned that (in light of the COVID-19 pandemic) many residents who have an approved release residence are sent to GPS-monitoring home confinement after a short stay at the Brooklyn House.

9

sentenced in 2008, prison for 180 months was "sufficient, but not greater than necessary," to achieve the goals of sentencing. But it is respectfully submitted that had the Court known (at the time of sentencing) about the COVID-19 pandemic and the inadequacy of BOP's "action plan," a more lenient sentence would have been imposed to reduce his exposure to COVID-19 illness or death. *See Scparta*, 2020 WL 1910481, at 8 ("While the Court's 18-month sentence reflected the seriousness of Mr. Scparta's offense and was at the time sufficient, but no greater than, necessary to achieve the purposes of sentencing, the Court's analysis is different in present circumstances. Specifically, due to the COVID-19 pandemic, the 'history and characteristics of the defendant' and 'the need to provide the defendant with needed medical care,' now weigh heavily in favor of Mr. Scparta's release, given the health risk that continued incarceration poses to him." (internal quotation marks and brackets omitted)).; *Gross*, 2020 WL 1862251, at 3 ("[W]hile the Court's original 60-month sentence reflected the seriousness of the offense at the time, contracting COVID-19 could transform that sentence into a death sentence for Mr. Gross.").

*******************************

WHEREFORE, for the reasons stated in Jeffrey's BOP petition, compassionate release motion, and present reply, the Court should grant the relief requested on page 1 and in footnote 5 of this reply.

Respectfully submitted,

_____/S/_____
Stuart Gold, Esq.
Brafman & Associates, P.C.
767 3rd Avenue, 26th Fl.
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906